NOT DESIGNATED FOR PUBLICATION

No. 114,969

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TODD D. SCHUMACHER,
*Appellant*,

v.

STATE OF KANSAS,
*Appellee*.


MEMORANDUM OPINION

Appeal from Wichita District Court; ROBERT J. FREDERICK, judge. Opinion filed February 10, 2017. Affirmed.

*William K. Rork* and *Matthew R. Williams*, of Rork Law Office, of Topeka, for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.

Before HILL, P.J., GREEN, J., and BURGESS, S.J.

*Per Curiam*: Todd D. Schumacher moved for relief under K.S.A. 60-1507, arguing that the prosecutor at his jury trial violated his rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution. The trial court summarily denied his K.S.A. 60-1507 motion for two reasons. First, the trial court held that Schumacher's argument was barred under the doctrine of res judicata. Second, the trial court held that Schumacher had failed to plead persuasive exceptional circumstances allowing him to collaterally attack the alleged trial error under K.S.A. 60-1507. On appeal, Schumacher argues that the trial court erred because his argument was not barred under the doctrine of res judicata, his exceptional circumstances arguments were

1

persuasive, and his underlying Confrontation Clause violation argument was meritorious. Nevertheless, all of Schumacher's arguments are unpersuasive. As a result, we affirm the trial court's summary denial of Schumacher's K.S.A. 60-1507 motion.

In *State v. Schumacher*, 298 Kan. 1059, 1060-66, 322 P.3d 1016 (2014), our Supreme Court explained the underlying facts of Schumacher's first-degree premeditated murder trial and conviction as follows:

"[T]he evidence presented at Schumacher's trial showed that on March 22, 2010, Schumacher learned that his ex-wife Ann was seeking child support and full custody of two of the couple's three children. The following morning, Schumacher went to Ann's home before the children left for school. Schumacher had a brief conversation with Ann at the door of the home before pulling a gun out of his jacket and firing it at Ann, killing her instantly as their 15-year-old daughter watched nearby. Afterward, Schumacher drove to the Wichita County Sheriff's Office and turned himself in. More specifically, the evidence presented at trial showed as follows.

. . . .

"At the time of these events, Schumacher and Ann's 17-year-old daughter, Megan, lived with Schumacher. Megan testified that on the evening of March 22, 2010, her aunt, Laura Schumacher, called to tell her that Schumacher was upset and drunk and had threatened to kill Ann. But Megan testified, '[Laura] said that [Schumacher] stated that, but I don't know. He just was really upset about what had happened.' Nevertheless, Megan sent a text message to a cousin that evening: 'Well, I guess mom filed for full custody and dad is going to kill her.'

"When Megan woke up on the morning of March 23, 2010, she saw that Schumacher had sent her a text about 2 a.m. as he was leaving Gerstberger's home. In the text, Schumacher told Megan she was his 'everything' and he loved her. Schumacher was not home when Megan got up that morning.

"Schumacher and Ann's 15-year-old daughter, M.S., testified that she and her brother were both still at Ann's home when Schumacher arrived the morning of the shooting. As M.S. prepared to go to a neighbor's home where she had a ride to school, she saw Schumacher just outside the front door talking to Ann. M.S. heard her parents

2

arguing and decided to stay in the living room where she sat on the arm of a chair so she could still see her parents.

"During the confrontation between her parents, M.S. recalled that she had a small camera in her pocket. M.S. knew a custody battle was pending so when she heard Schumacher making false statements, she held the camera by her side and turned on the its video function.

"M.S. heard Ann tell Schumacher that he was harassing her, and Schumacher replied, '[S]o this is harassment[?]' Ann responded, '[Y]eah, this, this is harassment.' According to M.S., at this point Schumacher unzipped his jacket, stepped forward into the house, put his hand on Ann's shoulder, and pressed a gun underneath her chin. Ann gasped, and the gun fired. M.S. testified Ann immediately fell to the floor. Schumacher then went to his pickup and 'after awhile he drove off.'

"The State admitted M.S.'s video and played it for the jury. M.S. testified she did not 'flaunt' the camera, so the focus darts around the room and the audio is partially obscured as M.S. apparently covers or scrapes the microphone. The State introduced, and the district court admitted, multiple copies of the recording, including an enhanced, audio-only version intended to reduce background noise.

"The video shows Ann standing just inside the front door speaking to Schumacher, who cannot be seen. At one point, Ann says to Schumacher, 'I'm not going to get into it,' to which Schumacher replies, 'Well, you can't hang up the phone now. You can't file phone harassment charges on me.' Ann then asks, 'Why?' The next few statements are inaudible until Ann sighs and clearly says, 'Wow, what an example you're being for your kids right now.' After a few moments of unintelligible conversation, Schumacher then says, 'Here's your fucking example, right here.' Ann gasps, and the gun can be heard firing. In the last portion of the recording, the two children can be heard screaming and clamoring as they try to help Ann.

"The 911 dispatcher for the area testified that she received a call from M.S. at 8:18 a.m. and sent law enforcement to Ann's address. Four minutes later, Schumacher walked into the sheriff's office where the dispatcher sat, threw up his hands, said, 'Call [the sheriff], I'm here,' and then sat down in a chair. The dispatcher testified that at one point before the undersheriff arrived and took Schumacher into custody, Schumacher chuckled.

"Jamie Oeberst, M.D., the chief medical examiner at the Sedgwick County Regional Forensic Science Center, examined Ann and determined that a single gunshot

3

wound to her neck and head caused her death. Based on the stippling, or gunpowder deposited on the body, Dr. Oeberst determined the shot that killed Ann was fired from a distance of only 1 to 3 feet.

. . . .

"Case agent John Nachtman testified he photographed the scene of the shooting and collected, viewed, and enhanced the video from M.S.'s camera. Nachtman also searched the vehicle Schumacher normally drove and found a Smith and Wesson .22 caliber gun, ammunition for the Smith and Wesson, and a case for a Ruger revolver that used .357 caliber ammunition.

"KBI firearm and tool mark examiner Zachary Carr testified about his examination of the Ruger and explained that in order to fire the weapon, 'the hammer has to be manually pulled to the rear to cock it' and then 'the trigger has to be moved rearward.' He later emphasized, 'This firearm will not fire unless this hammer is pulled back. You can pull the trigger all you want, nothing will happen.' Further, Carr testified that approximately 3 3/4 pounds of pressure is required to pull the trigger.

"Carr further testified his examination of the bullet fragments taken from Ann's body showed they were fired from the Ruger found in Schumacher's pickup. At defense counsel's urging, Carr provided gloves so jurors could examine the Ruger during deliberation.

"Schumacher testified in his own defense and initially discussed several events preceding Ann's shooting. Schumacher explained that after he and Ann divorced, they initially shared custody, with the children living with him for a month and then with Ann for a month. According to Schumacher, because of the stress of the divorce and his farming operation, his mental health deteriorated in 2009. Schumacher testified that in December 2009, his friend Troy Wright found Schumacher in his pickup with the Ruger cocked. According to Schumacher, he had twice raised the gun to his own temple but could not pull the trigger. After this incident, Schumacher spent several days in the Greeley County Hospital.

"Schumacher further testified that on another unspecified occasion he tried to commit suicide by taking medication and drinking alcohol but Laura found him alive. Further, he solicited quotations for life insurance policies to provide for his children because he 'wasn't going to be around.'

"Schumacher conceded that he was upset when he received the custody paperwork from Ann on March 22, 2010, but he claimed he did not remember threatening

4

Ann. He said he was drunk that day, and after he left [a friend's] home, he went to his own home and looked at some bills, which further depressed him because for quite some time he had been borrowing $3,000 a month to cover his personal and farming operation expenses.

"Schumacher decided to kill himself with 'one special bullet,' a single shot from his Ruger. According to Schumacher, he purchased both the special bullet and the Ruger from his college roommate and he always kept the Ruger cocked and with him because of a fear that he would get trapped in a fiery car accident and not be able to get out.

"Schumacher testified he initially went to a pasture to kill himself but then decided that Ann should know what she was doing to him, so he decided to go to her house and shoot himself on the front porch after the kids had left for school. Schumacher realized when he arrived at Ann's home that his son and daughter had not left for school. Nevertheless, he claimed that since he had made up his mind to kill himself, he did not leave. Schumacher testified that when he 'went to shoot' himself, he heard a bang and realized what happened, so he walked away to turn himself in. Schumacher denied that he intended to kill Ann."

Additionally, several witnesses corroborated that Schumacher had suicidal tendencies. Nevertheless, Schumacher's girlfriend, sister-in-law, and friend, who all spoke with Schumacher the day before he killed Ann, testified that Schumacher had told them that he planned on killing Ann because of the custody situation.

The jury ultimately convicted Schumacher of first-degree premeditated murder and endangering a child. The trial court sentenced Schumacher to a controlling sentence of 25 years to life imprisonment.

On direct appeal to our Supreme Court, Schumacher raised many issues, including whether the trial court erred by denying his new trial motion because the prosecutor committed misconduct during closing arguments. Our Supreme Court analyzed Schumacher's prosecutorial misconduct argument as follows:

"[W]e consider Schumacher's argument that the prosecutor committed misconduct in suggesting the jury compare the sound of the gun cocking to the clicking sound heard on the video just before the shooting. Schumacher contends this was error because the State failed to establish through expert testimony that the sound the jury heard on the video was the same sound made when the prosecutor cocked the gun in open court during his rebuttal.

"The prosecutor devoted much of his rebuttal closing argument to discussing and replaying the video taken by M.S. and arguing the video contains an audible 'click,' which the prosecutor asserted was the sound of Schumacher cocking the gun. More specifically, the prosecutor argued the sound of a cocking gun is 'very distinctive,' and he cocked the weapon a total of nine times throughout his rebuttal argument. At one point, Schumacher objected, arguing that the prosecutor's assertion that the click heard on the video was the sound of Schumacher's gun cocking was a fact not in evidence.

"We have reviewed the videos and note that the unenhanced video does contain an audible 'click' about 45 seconds into the video in the middle of a statement made by Schumacher just moments before he shoots Ann: 'Here's your fucking example, [click], right here.'

"Preliminarily, we note that Schumacher's argument appears to be premised on two inaccuracies. First, Schumacher emphasized that because the audio had been enhanced, the State should have been required to put on expert testimony to compare the two sounds. But a review of the recordings reveals that the clicking noise is distinctly more audible on the unenhanced version of the recording than on the enhanced version, which was designed to eliminate background noises and highlight the conversation between Schumacher and Ann.

"Second, Schumacher's argument is based in part on the fact that the prosecutor was the first person to demonstrate in open court the sound of the gun cocking. However, citing to the transcript, the State suggested in its response brief that defense counsel first cocked the gun for the jury during his closing argument. When questioned by this court during oral argument about the State's assertion, Schumacher's appellate counsel, who also was his trial counsel, adamantly denied that he had done so, exclaiming, 'No way did I cock that gun. Absolutely, positively not.'

"But our review of the record reveals that the State is correct. Despite his strong denial, defense counsel did in fact cock the gun for the jury during his closing argument and did so prior to the prosecution cocking the gun. Specifically, while explaining how

6

Dr. Oeberst's and Carr's testimonies supported Schumacher's accidental shooting defense, defense counsel said, 'If I want to kill somebody and I'm standing there on the front porch . . . and I pull out a gun and it is already cocked, (cocking gun), no matter [what] . . . it has to be up, gun up.' Further, it was defense counsel who suggested the jurors be given gloves so that they could examine the gun and operate it themselves.

"Thus, as the State points out, before the prosecutor ever cocked the gun for the jury and asked the jury to listen to the sound of the click, the gun had been cocked by defense counsel. Further, the video in which the clicking sound can be heard had been played for the jury and introduced into evidence. Thus, the real issue is whether the prosecutor commented on a fact not in evidence by asking the jury to compare two sounds in evidence.

"Our caselaw does not support Schumacher's suggestion that the prosecutor asked the jury to draw an inference 'akin to a scientific conclusion' by asking it to find that the clicking sound heard on the recording was the sound of the gun being cocked. [Citations omitted.]

"Similarly, the facts of this case are not comparable to circumstances in which we have found that the prosecutor commented on or stated facts not in evidence. [Citations omitted.]

"Instead, the prosecutor here simply asked the jury to compare the sound heard in the courtroom with the sound on the video. Further, the prosecutor reminded the jury it could 'decide what that sound [on the video] is.' Under these circumstances, we find the trial court correctly concluded that the prosecutor fairly commented on the evidence and did not commit misconduct when he suggested that the clicking sound heard when the gun was cocked was the same clicking sound heard on the video just prior to Schumacher shooting Ann." *Schumacher*, 298 Kan. at 1070-72.

On April 27, 2015, Schumacher moved for relief under K.S.A. 60-1507. In his memorandum in support of the K.S.A. 60-1507 motion, Schumacher emphasized that whether his gun was cocked before he shot and killed Ann was a material fact in dispute at trial. Again, at trial, Schumacher had argued that the gun was already cocked, meaning that the clicking sound heard on the recordings was not the sound of him cocking the gun. According to Schumacher, the alleged fact that his gun was already cocked increased the likelihood that he accidently shot Ann.

7

In his K.S.A. 60-1507 motion, Schumacher reemphasized that the State never presented expert testimony regarding whether the click sound heard on the recordings was actually the sound of him cocking the gun. Schumacher asserted that because there was no expert testimony, he was unable to cross-examine any expert on whether the click was actually the sound of the gun being cocked. Schumacher argued that the prosecutor's statement about the click on the recordings being the sound of his gun cocking was misconduct, which "resulted in a violation of his Sixth Amendment right to confront witnesses." Schumacher alleged that "the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process." Schumacher further recognized that he was raising a trial error that required him to plead exceptional circumstances. Schumacher asserted that exceptional circumstances existed because our Supreme Court erred in deciding his direct appeal.

The State responded that the trial court should summarily deny Schumacher's K.S.A. 60-1507 motion without an evidentiary hearing under the doctrine of res judicata. The State asserted that Schumacher had raised the same prosecutorial misconduct argument in his direct appeal. The State further responded that there were no exceptional circumstances allowing Schumacher to make his trial error challenge under K.S.A. Last, the State emphasized that the trial court was not in a position to overrule our Supreme Court's rulings regarding the absence of prosecutorial misconduct.

Schumacher countered that his motion was not barred under the doctrine of res judicata because he was raising a different legal claim. Schumacher argued that "instead of prosecutorial misconduct, [he was] rais[ing] a violation of his Sixth Amendment right to confront witnesses." Schumacher denied that he alleged prosecutorial misconduct in his original motion. Schumacher argued that the prosecutor violated his Sixth Amendment right to confront witnesses by making the comment about the clicking sound in the recordings being the sound of him cocking the gun. He also reiterated his

8

arguments regarding why exceptional circumstances to consider his trial error challenge under K.S.A. 60-1507 existed.

On November 5, 2015, the trial court summarily denied Schumacher's K.S.A. 60-1507 motion. The trial court found that Schumacher had "completely ignore[d] [] that a direct appeal was taken by him, and [his] claim [was] one that he either did raise, or could have and should have raised." Thus, the trial court held that Schumacher's motion was barred under the doctrine of res judicata. The trial court further held that Schumacher's arguments regarding why exceptional circumstances existed failed and were barred under the doctrine of stare decisis. Then, the trial court adopted the State's arguments and analysis in response to Schumacher's K.S.A. 60-1507 motion.

*Did the Trial Court Err by Summarily Denying Schumacher's K.S.A. 60-1507 Motion?*

Schumacher's argument on appeal has three parts. First, Schumacher argues that his claim concerning the alleged Confrontation Clause violation is not barred under the doctrine of res judicata because, unlike in his direct appeal, he is not arguing that the prosecutor made a statement of fact not in evidence that constituted prosecutorial misconduct. Second, he concedes that he is using his K.S.A. 60-1507 motion as a vehicle to challenge a trial error, but he argues that exceptional circumstances exist allowing him to do so. Specifically, Schumacher argues that our Supreme Court's findings and rulings in his direct appeal were so errant that exceptional circumstances exist. Third, he contends that his underlying arguments about the alleged Confrontation Clause violation have merit.

*Standard of Review*

Following the summary denial of a K.S.A. 60-1507 motion, an appellate court exercises de novo review over whether the motions, files, and records of the case

9

conclusively establishes that the movant is not entitled to relief. *Sola-Morales v. State*, 300 Kan. 875, 881, 335 P.3d 1162 (2014).

*Res Judicata*

"The doctrine of res judicata is a common-law rule of equity grounded in both notions of justice and in sound public policy, each of which demands that a party not be vexed with litigation twice on the same cause." *Cain v. Jacox*, 302 Kan. 431, 434, 354 P.3d 1196 (2015). "[T]he res judicata doctrine applies when a party collaterally attacks a judgment or brings a second action arising from the same facts or circumstances against one (or more) of the original parties." *State v. Kleypas*, 305 Kan. 224, 244, 382 P.3d 373 (2016). Four conditions must exist before a claim can be barred as res judicata: (1) same claim; (2) same parties; (3) claims that were actually raised or could have been raised in a prior proceeding; and (4) a final judgment on the merits. *Cain v. Jacox*, 302 Kan. at 434. "[W]hen a criminal defendant files a direct appeal from his or her conviction and sentence, 'the judgment of the reviewing court is res judicata as to all issues actually raised; those issues that could have been presented, but were not presented, are deemed waived.'" *Woods v. State*, 52 Kan. App. 958, 965, 379 P.3d 958 (2016) (quoting *Drach v. Bruce*, 281 Kan. 1058, Syl. ¶ 12, 136 P.3d 390 [2006]).

Schumacher argues that res judicata does not bar his K.S.A. 60-1507 claim because the legal claim he now raises is not the same as the legal claim he raised on direct appeal. Schumacher argues that he is not challenging whether the prosecutor committed misconduct. Instead, he argues that he is challenging whether the prosecutor violated his right to confront witnesses under the Sixth Amendment to the United States Constitution by making the statement that the clicking sound heard on the recording was the sound of his gun cocking. Schumacher explains that the prosecutor's statement violated the Confrontation Clause because it was a statement of fact, not supported by "an expert firearm witness" or any other evidence at trial, meaning he had no ability to

10

confront this statement of fact through cross-examination. Schumacher contends that this claim is not the same as his claim on direct appeal because "a claim of prosecutor misconduct based on the prosecutor's comment stating a fact not in evidence is not the same as confrontation issues."

The State counters that the trial court correctly ruled that Schumacher's claim was barred under the doctrine of res judicata. The State points out that on direct appeal Schumacher challenged whether the prosecutor's statement regarding the clicking and gun cocking sounds constituted misconduct because the "statement amounted to facts not in evidence." Alternatively, the State argues that Schumacher's K.S.A. 60-1507 claim about prosecutorial misconduct resulting in a Confrontation Clause violation could have and should have been raised in his direct appeal.

The State is correct. To begin with, although Schumacher asserts that he is not raising a claim of prosecutorial misconduct, this unappealing technicality is incorrect. In his K.S.A. 60-1507 motion, Schumacher explicitly stated that his claim was as follows:

> "Schumacher maintains, as he did on direct appeal, [that] prosecutorial misconduct deprived him of a fair trial. Schumacher additionally contends prosecutorial misconduct, which occurred during the closing arguments, resulted in a violation of his Sixth Amendment right to confront witnesses, and the prosecutor's misconduct so infected the trial with unfairness as to make the resulting conviction a denial of due process."

It was only after the State responded to Schumacher's K.S.A. 60-1507 motion, arguing that his claim of prosecutorial misconduct was barred by res judicata, that Schumacher abruptly discarded his prosecutorial misconduct claim. Indeed, after the State's response, Schumacher emphasized that his claim involved a Confrontation Clause violation, not prosecutorial misconduct.

11

Yet, even on appeal, despite Schumacher's best efforts to advance his supposed technicality between the prosecutorial misconduct claim and the Confrontation Clause claim, it is evident that his claim still turns on the existence of prosecutorial misconduct. For instance, in his appellant's brief, he contends that the "[s]tatements made by [the] prosecutor during his summation, *which present*[*ed*] *a fact not shown by the evidence*, den[ied] the essential right of confrontation." (Emphasis added.) See *State v. Carter*, 278 Kan. 74, 80, 91 P.3d 1162 (2004) (holding that a statement by a prosecutor on a fact not in evidence constitutes misconduct).

Thus, Schumacher's K.S.A. 60-1507 argument has two parts. The first part of his argument is that the prosecutor committed misconduct by comparing the clicking sound on the recording and the sound of his gun cocking because this was a fact not in evidence. The second part is that the misconduct led to a Confrontation Clause violation because he "was unable to confront" the prosecutor's statements about the sounds because the statement was about a fact not in evidence. This means that Schumacher cannot make his Confrontation Clause violation argument without first successfully making his prosecutorial misconduct argument. Stated another way, Schumacher's Confrontation Clause argument can succeed only if the prosecutor committed misconduct by making a statement on a fact not in evidence.

As set out in the facts section of this opinion, however, Schumacher challenged whether the prosecutor's statement about the sounds constituted misconduct in his direct appeal. *Schumacher*, 298 Kan. at 1069. Schumacher asserted that the prosecutor's statement constituted misconduct, in part, because no expert testimony was presented to establish the sound of the click on the recordings was the same as the sound of his gun being cocked. He argued that this meant the prosecutor made a comment on a fact not in evidence resulting in misconduct. Our Supreme Court rejected this argument because it determined that the prosecutor never made a statement of fact not in evidence. *Schumacher*, 298 Kan. at 1070, 1072.

12

Accordingly, while Schumacher did not raise the second part of his current K.S.A. 60-1507 claim—the Confrontation Clause violation argument—on direct appeal, he did raise the first part of his K.S.A. 60-1507 claim—the prosecutorial misconduct based on making a statement of fact not in evidence argument—in his direct appeal. This means that the first part of Schumacher's K.S.A. 60-1507 claims involves the same parties and the same prosecutorial misconduct claim that he actually raised in his direct appeal, which was rejected by our Supreme Court. Thus, all of the elements of res judicata exist. Consequently, the first part of Schumacher's K.S.A. 60-1507 claim—the prosecutorial misconduct based on making a statement of fact not in evidence argument—is barred. In turn, the second part of Schumacher's K.S.A. 60-1507 claim—the Confrontation Clause argument—is also barred under the doctrine of res judicata because this argument hinges on Schumacher successfully establishing the first part of his claim.

Finally, as stated earlier, in res judicata, the first judgment is conclusive, not only on all matters which were actually raised, but also on all matters which could have been raised. Schumacher's argument that there was a Confrontation Clause violation is premised on his belief that the prosecutor made a statement of fact not in evidence, which was the same argument that he raised in his direct appeal. Thus, Schumacher could have and should have raised his Confrontation Clause argument in his direct appeal. As a result, his argument is barred under the doctrine of res judicata.

Affirmed.