No. 84,488

KENNETH SHELTON and MARY JO SHELTON, as sole heirs of Alexis Danielle Shelton, *Appellees*, v. SUSAN R. DEWITTE, *Appellant*.

(26 P.3d 650)

Opinion filed July 13, 2001.

*David S. Brake*, of Henshall, Pennington & Brake, of Chanute, argued the cause and was on the brief for appellant.

*Daniel J. Matula*, of Louisburg, argued the cause and was on the brief for appellees.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Kenneth and Mary Jo Shelton's daughter, who was 9 months pregnant, died in an automobile collision with a vehicle driven by Susan R. DeWitte. The Sheltons filed this wrongful death action seeking damages for the death of their daughter's unborn viable fetus. The district court denied DeWitte's motion for summary judgment. A jury awarded damages in the amount of $55,000 for the wrongful death of the unborn viable fetus. DeWitte appeals. The case was transferred from the Court of Appeals pursuant to K.S.A. 20-3018(c).

The question raised in this appeal is whether the plaintiffs Kenneth and Mary Jo Shelton have a cause of action under the wrongful death statute for the death of the unborn fetus of their deceased daughter.

Material facts are not in dispute. The following numbered paragraphs are taken from the district court's journal entry denying DeWitte's motion for summary judgment:

"1. On January 2, 1997 Christina M. Shelton was killed in an automobile accident in Miami County, Kansas. At the time of her death Christina M. Shelton was nine months pregnant. The fetus died as a result of the accident without being born alive. The fetus was named Alexis Danielle Shelton and a probate proceeding was filed in the Miami County District Court, case no. 97-PR-33 entitled in the Matter of the Estate of Alexis Danielle Shelton, deceased.

"2. Christina M. Shelton, the mother of the unborn fetus has never been married and had no other children.

"3. Plaintiffs Kenneth Shelton and Mary Jo Shelton are the parents of Christina M. Shelton. They have previously sued Susan DeWitte for the wrongful death of Christina M. Shelton. Kenneth and Mary Jo Shelton received the sum of $100,000.00 as a result of the prior Miami County wrongful death lawsuit 97-C-75.

"4. Plaintiff Mary Jo Shelton has testified that the father of the unborn fetus was among the attendees at a family wedding approximately nine months before Christina's death.

"5. Plaintiffs Kenneth and Mary Jo Shelton filed a probate action and claim to be the sole heirs at law for Christina's unborn child.

"6. Defendant has admitted liability causing the motor-vehicle collision on January 2, 1997.

"7. Defendant has admitted that the collision caused the death of Alexis Danielle Shelton.

"8. Alexis Danielle Shelton was an unborn viable fetus."

In *Hale v. Manion*, 189 Kan. 143, 368 P.2d 1 (1962), the court held that parents could maintain a wrongful death action for a stillborn viable child. The pregnant mother was involved in an automobile accident which damaged the placenta, and several days later the stillborn child was delivered. The wrongful death statute in effect at the time allowed the parents to maintain an action only if the child could have done so had he or she lived.

In 1963, the legislature adopted the current version of the wrongful death statute, which also permits an action if the deceased could have prosecuted one had he or she lived. K. S. A. 60-1901 provides:

"If the death of a person is caused by the wrongful act or omission of another, an action may be maintained for the damages resulting therefrom if the former might have maintained the action had he or she lived, in accordance with the

provisions of this article, against the wrongdoer, or his or her personal representative if he or she is deceased."

Who can sue is the subject of K. S. A. 60-1902, which provides in part: "The action may be commenced by any one of the heirs at law of the deceased who has sustained a loss by reason of the death." K. S. A. 60-1902 also limits the statutory cause of action to one action:

"Any heir who does not join as a party plaintiff in the original action but who claims to have been damaged by reason of the death shall be permitted to intervene therein. The action shall be for the exclusive benefit of all of the heirs who has [*sic*] sustained a loss regardless or [*sic*] whether they all join or intervene therein, but the amounts of their respective recoveries shall be in accordance with the subsequent provisions of this article."

See *Johnson v. McArthur*, 226 Kan. 128, 596 P.2d 148 (1979).

DeWitte maintains that there are several reasons why the Sheltons cannot bring a cause of action for the wrongful death of their granddaughter. Relying on *Hale*, DeWitte contends that the Sheltons do not have a right of action for the death of the unborn fetus because they are not the fetus' parents. In the particular facts of *Hale*, the question that was answered by the court was whether the parents of an unborn viable fetus who dies prior to birth as the result of another's negligence have a cause of action under the wrongful death statute. The court's statement of the governing principle, however, does not restrict such a cause of action to the parents of the fetus: "Under our wrongful-death statute (G. S. 1959 Supp. 60-3203) an action may be maintained for the wrongful death of a viable unborn child resulting from the negligent acts of another." 189 Kan. 143, Syl. The court's statement of the governing principle refers to the wrongful death statute, which permits an action by the heirs at law of the deceased. Neither the statute nor *Hale* limit the filing of a wrongful death action of a fetus to a parent.

DeWitte also cites two cases from the courts of other states, which she contends limit the right of action for the wrongful death of an unborn fetus to the parents of the fetus. The cases are *Cert. of Question of Law from U.S. Dist. Ct. v. Mt. Marty Hospital Assoc.*, 387 N.W.2d 42 (S.D. 1986), and *Greer v. Parsons*, 103 N.C. App. 463, 405 S.E.2d 921 (1991), *aff'd* 331 N.C. 368, 416 S.E.2d

174 (1992). Neither stands for the proposition advocated by DeWitte.

The sole question certified in *Mt. Marty* was whether the South Dakota statute provided a cause of action for the wrongful death of a viable unborn child, and the South Dakota Supreme Court concluded that it did. 387 N.W.2d at 43. The South Dakota wrongful death statute, as amended in 1984, is quoted in the opinion and includes the following proviso: "However, an action under this section involving an unborn child shall be for the exclusive benefit of the mother or the lawfully married parents of the unborn child." 387 N.W.2d at 43. If the right of action for wrongful death of a viable unborn fetus lies only with a parent or parents in South Dakota, it is due to the express statutory limitation. Such a limitation was not the subject of the case cited by DeWitte. The Kansas statute does not contain such a limiting provision. Appellant's reliance on *Mt. Marty* is misplaced.

In *Greer*, a husband and wife were injured in a traffic accident and their viable unborn fetus was killed. The principal question was whether a release executed by the parents of the viable unborn fetus discharging the defendants for all the parents' claims barred the wrongful death action on behalf of the fetus. The North Carolina Court of Appeals concluded that it did not and the decision was based, at least in part, on the North Carolina procedure in which a wrongful death action is maintained by the estate of the deceased. 103 N. C. App. at 466-67. Thus, the mother, who had qualified as administratrix of the estate of the unborn child, prosecuted the wrongful death action against the tortfeasors. *Greer* does not advance DeWitte's cause.

Relying on *Johnson*, DeWitte contends that the Sheltons do not have a right of action for the death of the unborn fetus because they are not the fetus' heirs at law. In *Johnson*, the court held that the widow, by virtue of surviving 30 minutes longer than her husband, was his heir at law. Thus, the deceased husband's parents could not maintain a wrongful death action for the death of their son. The court stated the rule as follows: "Where a childless deceased is survived by a widow, the widow is the deceased's sole heir at law and she (or her personal representative) is the only

person authorized by K.S.A. 60-1902 to bring an action for the wrongful death of the deceased." 226 Kan. 128, Syl. ¶ 3.

Here, DeWitte argues that Alexis' sole heir is her natural father, and since there is no evidence that he predeceased her "the cause of action for her wrongful death lies solely with him." The point would be well taken if there were no question as to the identity of Alexis' father. However, the natural father has not acknowledged paternity of Alexis or intervened in this wrongful death action. Alexis' natural father is unknown and has failed or refused to acknowledge the unborn child or to exercise any legal right.

In the present case, the trial court listed among the undisputed facts that the Sheltons "filed a probate action and claim to be the sole heirs at law for Christina's unborn child." In fact, the Sheltons have been judicially determined and decreed to be the heirs at law. They filed in the probate department of the district court a petition for determination of descent for the purpose of determining the fetus' heirs for purposes of the wrongful death statute. A decree of descent was issued by the judge in the probate proceeding stating that the Sheltons are the heirs at law for purposes of the wrongful death statute and declaring that the Sheltons are the persons entitled to bring an action under K.S.A. 60-1901 *et seq.* for the death of the unborn fetus. The decree of descent stated that notice of the proceedings had been given as required by law by order of the court.

In this regard, DeWitte argues that the Sheltons should not be permitted to maintain the wrongful death action unless and until there is a "finding" that would explain why the biological father of the unborn viable fetus has not filed a wrongful death action. There is no merit to this suggestion. As a matter of fact, it is not apparent from the record that the biological father in this case is aware of his role. If he was aware, as a matter of law, he had the statutory right to intervene in the wrongful death action, regardless of who initiated it. K.S.A. 60-1902. Moreover, any recovery is apportioned by the trial judge

"with reasonable notice to all of the known heirs having an interest therein, such notice to be given in such manner as the judge shall direct. The apportionment shall be in proportion to the loss sustained by each of the heirs, and all heirs

known to have sustained a loss shall share in such apportionment regardless of whether they joined or intervened in the action." K.S.A. 60-1905.

And, even after funds have been distributed, a person who can show that he or she has been defrauded of a share in a recovery may reopen the matter. K.S.A. 60-1905.

Obviously, Alexis has a natural father, but his identity and paternity have not been established either in the proceedings for a decree of descent or in this case. Although initially questioning the authority of the decree of descent, the trial court ultimately accepted that the Sheltons are the heirs at law for purposes of prosecuting the wrongful death action: "To suggest or argue that under the facts and circumstances where a biological father cannot be found and does not come forward an action cannot be maintained for wrongful death would be tantamount [to] ruling that illegitimate children do not have the same rights and protections as legitimate children." We do not believe the legislature intended such an unjust result. If it did, K.S.A. 60-1902 could have been amended to give the parents the exclusive right to bring such an action. The claim does not belong to a father, it belongs to the heirs at law of the deceased. Under the circumstances in this case, the trial court correctly found the Sheltons to be the heirs at law to bring this wrongful death action.

Without citation to authority, DeWitte contends that even if grandparents can maintain an action for the wrongful death of an unborn viable fetus, the Sheltons should not have been allowed to maintain this action for the wrongful death of the unborn viable fetus after they already had recovered $100,000 in the action for the wrongful death of their daughter. Appellant's position is that the wrongful death of their daughter's unborn fetus is inextricably interwoven with their daughter's death so that the Sheltons improperly split their cause of action by filing two separate wrongful death actions.

The rule against splitting a cause of action is for the protection of a defendant and aimed at avoiding piecemeal litigation where all claims could and should be adjudicated in one lawsuit. See, *e.g.*, *Winner v. Ratzlaff*, 211 Kan. 59, 505 P.2d 606 (1973). It is the doctrine of res judicata that

"prevents the splitting of a single cause of action or claim into two or more suits. The doctrine of *res judicata* requires that all the grounds or theories upon which a cause of action or claim is founded be asserted in one action or they will be barred in any subsequent action. [Citation omitted.]" *Parsons Mobile Products, Inc. v. Remmert*, 216 Kan. 138, 140, 531 P.2d 435 (1975).

The Sheltons' position is that there were two separate and distinct causes of action for the deaths of their daughter and the unborn viable fetus. Based on the plain language of the wrongful death statute, we agree. K.S.A. 60-1901 creates a cause of action for the death of the Sheltons' daughter and a cause of action for the unborn viable fetus. Although it may have been desirable, from DeWitte's perspective and as a matter of judicial economy, for the Sheltons to have combined their claims or at least have pursued them simultaneously, the separate and sequential lawsuit for the wrongful death of the unborn viable fetus is not barred. Joinder of claims under the Kansas Code of Civil Procedure, K.S.A. 60-218(a), is permissive rather than mandatory: "A party asserting a claim to relief as an original claim . . . may join either as independent or as alternate claims as many claims . . . as he has against an opposing party."

The judgment of the district court is affirmed.

Six, J. dissenting: Christina M. Shelton attended a family wedding at a church in Miami County. The bridegroom was the nephew of Christina's mother, Mary Jo Shelton. Christina met a "guy" at the wedding. A sexual encounter followed and Christina later informed her mother that she was pregnant. When Mary Jo was asked if she knew many people at the wedding, she said: "Yes. Louisburg is Louisburg. You know everybody." However, Mary Jo did not find out who the father was. Christina told Mary Jo that the father did not want anything to do with Christina or the child, and Mary Jo thought: "Why pursue it? If he's not willing to help deal with the situation, if he's not man enough to admit it, I wouldn't bother about it."

Then, tragedy struck the Shelton family. An automobile accident took the life of Christina and the life of a viable fetus whose parents were this "guy" and Christina. The parties agree that Mary Jo tes-

tified, that the father of the unborn fetus was among the attendees at a family wedding approximately nine months before Christina's death.

Kenneth Shelton and Mary Jo, Christina's parents, filed an earlier wrongful death action for Christina's death against Susan R. DeWitte, the defendant here. Their capacity to sue was legislatively established by K.S.A. 60-1902, as they were Christina's heirs at law. After receiving a recovery for Christina's death, they sued DeWitte for the wrongful death of the viable fetus.

Before suing here, Mary Jo filed a verified petition in the probate department of the district court of Miami County for a determination of descent of the fetus. Her petition asserted that she was a grandparent of the fetus and that the heirs of the fetus "so far as known or can with reasonable diligence be ascertained are" Kenneth, the grandfather, and herself as grandmother. DeWitte was not a party to the determination of descent action. Mary Jo's verified probate petition fails to reference the father of the fetus. The father is ignored. The order determining descent found:

> "The heirs, for the purposes of the Kansas Wrongful Death Statute, are under the laws of intestate succession as follows:
>
> | Name | Proportion |
> | --- | --- |
> | Kenneth Shelton | 50% |
> | Mary Jo Shelton | 50%" |

A brief review of the statutes on intestate succession is appropriate at this point in my analysis. The limitations on descent are established in K.S.A. 59-509. The controlling statute for the fact situation here is K.S.A. 59-507. If a decedent leaves no surviving spouse, child, or issue, "but leaves a surviving parent . . . all of his or her property shall pass to such surviving parent." Did the viable fetus leave a surviving parent? That is the question. Kenneth and Mary Jo would only have the capacity to sue here if the fetus left no surviving parent. K.S.A. 59-508.

The man that Christina met at the Louisburg family wedding, as the surviving parent, has been given a K.S.A. 59-507 claim for the wrongful death of his child, the viable fetus. The claim is his to assert or to ignore. Marriage to Christina would not have af-

fected that result. The father, as the surviving parent, holds the claim. A wrongful death claim arising from the death of an illegitimate viable fetus predeceased by its mother is treated no differently than a similar claim arising from the death of a viable fetus born to married parents. The father as the surviving parent, married or unmarried, retains sole control of a K.S.A. 60-1901 claim for the wrongful death of his child.

Assume a young man and woman meet at a wedding; they marry, the woman becomes pregnant, the future father abandons her and disappears. The young woman and the viable fetus she is carrying are killed. The maternal grandparents would not have standing to file a wrongful death action for the death of the viable fetus. Illegitimacy is a nonissue here.

We have said:

"Standing is a question of whether the plaintiff has alleged such a personal stake in the outcome of a controversy as to warrant invocation of jurisdiction and to justify exercise of the court's remedial powers on his or her behalf. A party must have a sufficient stake in the outcome of an otherwise justiciable controversy in order to obtain judicial resolution of that controversy." *Moorhouse v. City of Wichita*, 259 Kan. 570, 574, 913 P.2d 172 (1996).

Here the issue of standing is controlled by a statutory limitation on the capacity to sue.

The only way that the father's claim may be transferred to Mary Jo and Kenneth is by the father's death. K.S.A. 59-508 would then apply. If the father is dead, under K.S.A. 60-1902, Mary Jo and Kenneth could secure a wrongful death recovery subject to apportionment for the benefit of all the heirs at law of the fetus, including the father's heirs at law. The majority's discussion of apportionment would be apt for that fact situation. However, here there is no finding of the father's death, and, thus, Mary Jo and Kenneth have no capacity to sue. Mary Jo testified that Christina told her that the father did not want anything to do with Christina or the child-to-be. Thus, Mary Jo thought: "Why pursue it?" A constant throughout the Sheltons' approach to the litigation here has been to ignore the father.

I do not know what inquiry other prospective maternal grandparents would have made if confronted by a similar tragedy. Ju-

dicial comments should be tender when reviewing actions arising after the death of loved ones. However, in observing the human condition, a common reaction to news of a pregnant unwed daughter could logically run to an inquiry as to who the father is, particularly in a small community where everybody knows everybody. A few reasons for inquiry might be genetic considerations for the future health of the child, child support obligations, and a natural grandparent curiosity. The result of the majority opinion is to deny the relief the Sheltons received here to future similarly situated prospective grandparents who do pursue a daughter's pregnancy and learn the father's identity.

I cannot endorse the emphasis placed by the majority on Mary Jo's verified petition for a determination of a descent and upon the court order following the petition. How could Mary Jo verify that she and Kenneth were the only heirs at law of the fetus? If she did not know who the father was, how could she, in effect, verify he did not exist? If such an order controls the capacity to sue in a later wrongful death action, why could not a parent, dissatisfied with a daughter's choice of husband, significant other, or sexual partner, file a similar probate petition resulting in a similar order, thus, perpetuating a fraud on the court.

The majority hitches its rationale for affirming the Sheltons' recovery to the identity of the father. The key language used by the majority is:

> "Here, DeWitte argues that Alexis' sole heir is her natural father, and since there is no evidence that he predeceased her 'the cause of action for her wrongful death lies solely with him.' The point would be well taken if there were no question as to the identity of Alexis' father."

The result of the majority opinion is to judicially embrace a "why pursue it, why bother" policy. For example, I offer three illustrations:

First: A and B. Their pregnant daughter is married; an accident takes her life and the life of the viable fetus. The father is known. A and B have no capacity to sue for the wrongful death of the fetus. Result: no recovery by grandparents.

Second: C and D. Their pregnant daughter is unmarried, an accident takes her life and the life of the viable fetus. The prospective father has no interest in his sexual partner or in the issue of the encounter. C and D, rather than say "why

pursue it, why bother," pursue the inquiry and learn the father's identity. C and D, like A and B, have no capacity to sue for the wrongful death of the viable fetus. Result: no recovery by grandparents.

Third: Kenneth and Mary Jo. They do not bother to pursue the inquiry and Mary Jo testifies she does not know the father's identity. Result: recovery by grandparents.

The result is the recognition of a wrongful death claim limited solely to grandparents of illegitimate grandchildren who do not bother to pursue the identity of the father who is jointly responsible for their deceased daughter's pregnancy.

The wrongful death claim here is the father's to lose, not to win. Only his death may take the claim from him. Any litigant seeking to take over the claim must carry the burden of proving entitlement by proving the death of the surviving parent. The father's death is a condition precedent to the shift of capacity to sue from the surviving parent to the Sheltons. Nowhere in the record is the father's death alleged. The condition precedent has not been met. The claim here may never be filed. The father of an illegitimate viable fetus, whose identity is known, also has the sole capacity to file such a claim. He may choose not to, thus, such a claim may also never be filed.

Wrongful death claims did not exist at common law. Wrongful death actions are legislatively created. *Prowant, Administratrix v. Kings X,* 184 Kan. 413, 417-18, 337 P.2d 1021 (1959), (Jackson, J. dissenting), *reh. granted* and dissent adopted as opinion of the court, 185 Kan. 602, 347 P.2d 254 (1985). As the current Chief Justice wrote for the court in an earlier case involving a wrongful death claim:

"In all likelihood, it would be impossible to draft a statute which would be fair to all persons in all cases. The legislature has spoken, however, by enacting the present statutes, and it is not the role of this court to speculate on possible improvements therein." *Johnson v. McArthur,* 226 Kan. 128, 135, 596 P.2d 148 (1979).

I cannot join the majority in judicially creating a new wrongful death claim available only to the maternal grandparents, who choose not to pursue the identity of the father of an illegitimate viable fetus, whose mother is also deceased.

The Sheltons have no capacity to sue. The verdict of the jury should be set aside and summary judgment entered for Susan R. DeWitte, the defendant.

MCFARLAND ,C.J. and LARSON, J., join in the foregoing dissenting opinion.